## LEVERICH, Executor *v.* RICHARDS et al.

A cotton broker, to whom cotton had been delivered by the vendor to be sold at a fixed price
to some unknown principal, fraudulently obtained from the agent of a foreign house an ad-
vance upon it, on agreeing to consign the cotton to his principals for sale, and on delivering to
their agent bills of lading for it made out in his name. The latter knew that the broker had
not credit or means to purchase the cotton on his own account. In an action by the vendor
against the broker, and the agent by whom the advance had been made, the cotton was
sequestered, and the principals of the latter intervened and bonded the property, which
was afterwards sold, and the proceeds received by them. *Held*, that the delivery to the
broker was not a delivery under a contract of sale to any principal for whom he may have
been acting; that it merely invested the former with possession as a broker, which he was

bound to part with in favor of his principals on payment of the price, and on no other condition; that, on the supposition that he had no principal, he had only a possession based on fraud, and, being known as a broker, those who dealt with him dealt at their peril, unless they put themselves in communication with the owner; that the possession of the cotton by the broker was only an indication of the assent of the owner to a sale for cash in the usual course of business; that, there being no evidence of a custom among shippers to employ brokers to obtain advances on their shipments, the broker had no authority to pledge the property, which had been entrusted to him for another purpose; that the case would have been different, had the intervenors purchased and paid for the cotton in the usual course of business; and that the plaintiff is entitled to recover the value of the cotton from the intervenors.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. The executor of *Leverich* represents that, his testator, at the time of his death, was in possession of 253 bales of cotton, worth $7155, to the possession of which he succeeded as executor; that, about the 1st of July, 1844, one *Wm. W. Richards*, pretending to act as the agent or broker of *Spence*, fraudulently and without the knowledge, or consent of the petitioner, or of any one authorized by him, obtained possession of the cotton, without paying its price or any part thereof, and caused the same to be shipped immediately, and new marks to be placed thereon, and was about to export it when it was sequestered in this action; that he has been informed that *Spence* never employed or authorized *Richards* to buy the cotton on his account, but that *Spence* made certain advances to *Richards* on account of this and other cotton, but to what extent he knows not; that he has made *Spence* a defendant, to enable him to make a full disclosure in the premises; that the rights of *Spence*, in the premises, whatever they be, are derived from *Richards*, and are consequently inferior to those of the petitioner on the cotton, or its proceeds, *Richards* having obtained possession of the property fraudulently, the sale thereof never having been completed, nor possession given by petitioner, or by any one by him authorized; that, in case it be considered that a sale has taken place, petitioner is entitled to reclaim the property or its proceeds under his privilege as vendor, against *Spence*. It is further alleged that the cotton was stored in the warehouse of *Behan & Freeland*, and that, in consideration of certain storage and commissions paid, or promised to them, they agreed to keep the cotton safely, and to deliver it only to the petitioner, or his order; that they delivered it to *Richards* without petitioners knowledge or authority; and that if, in consequence thereof, *Spence* or others have acquired rights thereto superior to petitioner's, *Behan & Freeland* are responsible to him *in solido* for the value of the cotton. The petition concludes with a prayer "that the claims of *Spence* on said cotton be set aside and dismissed, or that *Spence* and *Richards* be condemned *in solido* and severally to pay to the petitioner the value thereof, $7155, with interest from judicial demand; and further, if it should appear on the trial that petitioner has lost his recourse upon the cotton, in consequence of the delivery of it by *Behan & Freeland*, that they be condemned to pay the sum of $7155, the value thereof, with interest as aforesaid; and for general relief," &c.

*Spence* answered by a general denial, and by adopting the allegations made by *Gower, Nephews & Co.*, in their petition of intervention. *Richards* was not cited. *Behan & Freeland*, after a general denial, admitted that they had the cotton in their warehouse at the time of *Leverich's* death, but averred that it was delivered to the order of the plaintiff, or his agent.

*Gower, Nephews & Co.* and *Spence*, who also joined in the intervention, allege

that they have for a long time employed *Spence* as their agent at New Orleans, to obtain for them consignments of merchandize, and to make advances for them thereon; that during the months of May and June, 1844, *Richards*, one of the defendants, made various consignments to them through the instrumentality of their agent *Spence*, to the amount of 1400 bales of cotton, on which consignments they, in the ordinary course of business, made large advances of money to *Richards*, to the amount of $38,330 34; that the sum of $11,440 69 was specially advanced by them through their agent to *Richards*, upon 431 bales of cotton, forming part of said consignments, among which 431 bales were the 253 bales sequestered in this suit; that before the issuing of the sequestration in this case, and in pursuance of the contract for advances and consignments, the said advance of $11,440 69 was made to *Richards* in cash, and possession of the whole of said 431 bales of cotton received by the intervenors, and bills of lading taken and held by them through their agent *Spence*, as will appear from the bills of lading annexed; all of which transactions of the intervenors were made in good faith, and in the ordinary and lawful course of business, and without any knowledge of the pretended rights of the plaintiff, which pretended rights the intervenors expressly deny. They further allege that, by reason of the premises and of their possession, they are entitled to a privilege on the whole of said 431 bales of cotton for the reimbursement of their advances, to wit, the sum of $11,440 69. together with all advances, disbursements and charges, for freight, insurance, dockage, port charges, storage, commissions, and all others lawfully incurred in the shipping, transportation, storage, &c. and in the sale of said cotton, and are entitled to the possession and control thereof, subject only to the liability of paying to *Richards*, or his lawful representative, or assigns, the residue, if any, of the proceeds of said consignment, after reimbursing said advances and charges. They pray for a judgment declaring them lawfully entitled to the possession and control of said 253 bales of cotton, with a privilege thereon for $11,440 69, and for charges, &c. according to the custom of trade, that the sequestration be discharged, and for general relief. They further pray, in case it should be decided that no lawful delivery was made to them of the cotton by *Behan & Freeland*, and no lawful possession was vested in them in consequence, that said *Behan & Freeland* may be condemned to pay them, as damages, the amount of any sum which the plaintiff may recover against them.

*Behan & Freeland* answered, by a general denial, so much of the intervention as referred to them.

The facts established on the trial of this case are fully stated in the following opinion of the judge of the Commercial Court:

" This litigation arises out of the fraudulent and irregular conduct of *W. W. Richards*. *James H. Leverich* had been a cotton factor from 1834 until the 17th June, 1845, when he departed this life, leaving *W. E. Leverich*, *S. J. Peters*, and his widow, as general executors, and directing that *W. E. Leverich* should wind up and close his commercial transactions. At the time of his death there were on hand between 200 and 300 bales of cotton, and 38 bales arrived the day after his decease. *W. E. Leverich* assumed to act according to the directions of the will, and has brought this suit as individual executor. It appears that *Richards* had several years ago acted as a cotton buyer and shipper; that about three years ago he took the benefit of the bankrupt law, and since then has acted generally as a broker, but has also undertaken to buy and ship, either on his own account, or in connexion with other persons. *Spence* is a commission mer-

chant, and also acts as the special agent of *Gower, Nephews & Co.*, to make advances to shippers of cotton    From January to June, 1844, *Spence* had advanced to *Richards*, either on his own account or on account of others, $60,000. *Spence* was about to close his transactions, and leave New Orleans, on the 3d July, 1844, to join the Boston steam packet of the 16th July.   In the last week of June, *Richards* applied to *Spence* to make further advances on cotton. *Spence* declined, and directed him to apply to others ; but, being importuned, agreed to make the advance provided the cotton was shipped and the transaction completed, in time for him to leave New Orleans on the 3d July, which was promised.   The advance was to be on 490 bales of cotton, samples of part of which were shown to *Spence*, and *Richards* promised to show him the rest of the samples when he could get and arrange them.

" *Fearn & Crenshaw* had sold cotton to *Richards*, on which *Spence* had made an advance, and *Richards* being backward in making payment, they applied to him, in a peremptory manner, requiring either to be paid, or to be allowed to take the shipment of cotton on their own account.   *Richards* excused himself by stating that he had laid out the advance which he had obtained on other cotton, on which he was also seeking to obtain an advance, promised as soon as he could accomplish this intention to pay them, and put them off till the next morning.   This application of *Crenshaw*, by comparison of dates, I conclude, must have been made on thursday, 27th June.   *Richards*, failing to comply, promised *Crenshaw* to give him the ship's receipts for the cotton. This was done about 12 o'clock, but *Richards* engaged *Crenshaw* to keep the ship's receipts until 3 o'clock, by which time he would either pay for the cotton, or *Crenshaw* might obtain bills of lading on the ship's receipts.   *Richards* not making his appearance at the time appointed, *Crenshaw* had bills of lading filled up and sent to *Gale's* office to be signed.   On examination and comparison there, it was found that bills of lading had already been signed for cotton of the same numbers, marks, &c., for *Spence*.   *Crenshaw*, thereupon, applied to *Spence*, threatening to have the cotton seized ; a threat which did not alarm *Spence*, as he considered himself safe in the possession of the bills of lading.   *Richards* explained and excused his conduct to *Spence* in the same manner in which he had excused himself to *Crenshaw*, by saying that he had laid out the advances he had received from *Spence* on the cotton bought from *Crenshaw* in other cotton, on which he was endeavoring to obtain an advance, and urged *Spence* to come to his relief by making such advance.   This conversation took place on friday, 28th June. Early on the morning of the 29th June, *Spence* went to *Richards'* office, and *Richards* showed him samples of 126 bales of cotton, which, as will be hereafter seen, had been bought by him from *Smith & Carroll*, and he promised to procure and arrange for his examination samples of other cotton, which he said he had bought to make up a quantity of 480 or 490 bales, upon which he desired that *Spence* should make the advance.   *Spence* agreed to make the advance, provided the cotton could all be shipped, and he could receive the bills of lading on or before tuesday, 2d July.   This was accordingly promised, and *Richards* requested *Spence* to engage tonnage for the cotton.   *Spence* accordingly went to *Whitney & Co.*, who engaged to ship it immediately, provided it was divided among three vessels, which was assented to, and an order given for the shipment of 126 bales on board the Martha Washington, and it was commenced to be shipped accordingly on saturday, 29th June.   Early in the morning of that day, and immediately on making his agreement with *Richards*, *Spence* called at

the office of *Fearn & Crenshaw*, and promised to pay them for the cotton they had sold to *Richards*, and did accordingly pay them the sum of $4,700, which was the whole amount of the sale, with the exception of $88, which was subsequently paid on the 2d July. At what hour on saturday the sum of $4,700 was paid to *Fearn & Crenshaw* is not proved ; but I take it for granted that it was somewhere between 12 and 2 o'clock, as *Spence* had not the money to disburse until he had negotiated bills with *Corning & Co.* I assume it to be proved, therefore, that the payment to *Fearn & Crenshaw* was not made until after the purchase of cotton from *Leverich*, which will now be related. The testimony of *B. Richards* as to the dates and sums, and the relative period of payments, derived from a hurried conversation, is not to be relied on to prove that *Spence* paid *Crenshaw* before he agreed to make the last advance to *Richards.*

" From the testimony of *Brown* we learn that, on saturday, 29th June, between 9 and 10 o'clock, *Richards* applied to him to purchase cotton. *Brown* had for sale 52 bales, of which he named the price, and which *Richards* agreed to purchase. *Brown* took *Richards* to the office of *Converse & Co.*, and the sale was agreed upon, *Brown* telling *Converse & Co.* that they must settle the transaction themselves with *Richards.* *Richards* then inquired of *Brown* if he knew of any other lot of cotton for sale. *Brown* answered that he did not, except a lot of 253 bales held by *Leverich & Co.*, and which, as it appears, *Brown* had attempted to buy for other parties, but they could not agree as to the price. *Richards* complained of being unwell, and requested *Brown* to go with him to *Leverich's* office, and assist him in the purchase, promising that he should have the factor's brokerage. They accordingly went to *Leverich's* office, and after negotiating with *Boon*, the clerk of *Leverich*, *Richards* went away, leaving *Brown* to complete the negotiation. After *Richards* went away, *Boon* inquired of *Brown* for whom *Richards* was buying the cotton. *Brown* testifies that he told him that he did not know, but thought it probable it was for *Spence*, as *Richards* had been buying for *Spence*. In his testimony on this subject *Boon's* statement varies, as on one examination he states that *Brown* told him that he supposed *Richards* was buying for *Spence*, and on another examination he states that *Brown* told him absolutely that *Richards* was buying for *Spence*, a statement which is directly contradicted by *Brown*. *Boon* submitted the offer for the cotton to *Leverich* and *Peters*, and, as he says, told them that the cotton was bought for *Spence*. *Peters* testifies that *Spence's* name was mentioned, but in what way he cannot say, as his mind was more intent on the price, than on the purchaser. The offer was accepted, and *Boon* on the same day, viz: saturday, 29th June, gave an order for the cotton in favor of bearer, designating the marks, numbers, price, and the sale to *Richards*. *Boon* at first drew the order in favor of *Brown* or order, but *Brown* refused to receive it in that form.

"*Behan*, the keeper of the cotton press, mentioned the subject on monday, 1st July, and desired an order from the executors. One was written and signed by them on that day, but it never passed out of their possession. *Graesbeck*, the weigher of *Leverich*, having been informed of the sale, weighed the cotton, and *Boon* made out the bill of parcels. The cotton was all delivered on board the respective vessels, and *Spence* received bills of lading for it, as shipped in his own name.

" There has been some attempt to doubt or question the authority of *Boon* to give the order, on the ground that he was a subordinate clerk, and that it did not come within the range of his duties. I am of opinion that there is sufficient

evidence to show that *Boon* acted in such matters, made sales of cotton, gave orders, &c. It would be of dangerous consequence to permit merchants to disavow the acts of their clerks, on the ground of the limited range of their duties; and both before and since this transaction there is abundant proof that *Boon*, who is of full age, was authorized to act as he did.

"The rights of *Spence*, as agent of *Gower, Nephews & Co.*, merchants making advances on the possession of bills of lading, are assailed on three grounds:

"I. That *Spence* did not act with proper caution, and that there were circumstances which ought to have induced him to suspect the conduct of *Richards*, and not to have made an advance to him, without inquiring whether the cotton had been paid for. These circumstances are, first, what had passed between *Crenshaw, Richards*, and *Spence*; secondly, the testimony of *Carroll*; and thirdly, the general manner and conduct of *Richards*. The testimony of *Crenshaw* has been detailed. *Carroll* testifies that he had sold cotton to *Richards*, who had given him the name of *Spence* as the buyer; that, when on application to *Richards*, he could not obtain payment, and was informed that the cotton was in progress of shipment, he applied on monday morning, 1st July, to *Spence*, to know whether he was the purchaser of the cotton, stating that *Richards* had given his name as purchaser. *Spence* informed him that he was not, but that he was to make an advance upon cotton which *Richards* had bought, and which was the same thing; that is, as I understand, it had reference to the same cotton. *Carroll* immediately proceeded to stop the delivery of the cotton, and this is doubtless the difficulty which is alluded to in the testimony of *Whitney*, where he states that the bills of lading were not ready as soon as was expected. This interview between *Carroll* and *Spence*, would seem to be a different interview from that which *Spence* relates as having taken place later in the day, and at which *Fitch* was present, and of which last interview *Carroll* has no recollection. I agree with the counsel for *Leverich*, that this matter was likely to be more deeply impressed on the memory of *Carroll* than of *Spence*. It came home to his interest, and caused him to take a very decided step. I therefore assume that *Carroll's* memory of the transaction is correct.

"The general circumstances as to the conduct and character of *Richards*, viz: his intemperance and state of distraction. I cannot see any weight in the evidence given on this subject. Several of the persons most intimate with him saw nothing peculiar or extraordinary in the conduct of *Richards*. *Richards* appears to have been a man of sanguine and somewhat peculiar character. On this first head, on which the weight of the rights of the defendant are assailed, I do not think that any sufficient matter has been proved. The transaction of *Richards* with *Crenshaw* was explained in a plausible manner, to the apparent satisfaction of all parties. *Spence* was at that time protected by his position, being the holder of bills of lading which could not be questioned, and he entered into the subsequent transaction reluctantly, and only with a view to accommodate *Richards*. From the slight manner in which *Carroll* testifies as to what occurred between himself and *Spence*, and the way in which it was treated, but little importance could be attached to it. *Carroll* does not state that he informed *Spence* that his purchase of cotton was not paid for, and *Spence* never appears to have been informed of the order to stop the shipment. After matters of fraudulent conduct have transpired, we are apt to look back, and perceive causes of suspicion in acts and conduct which would not have raised any suspicion in the most vigilant and careful. It is to be observed that, *Richards* obtained the con-

LEVERICH<br><i>v.</i><br>RICHARDS.

45

fidence of four houses, all of high respectability and character as business men, viz: *Fearn & Crenshaw, Mitchell & Logan, Smith & Carroll, Converse & Co.*, and also had transactions with many other houses, by whom he was held in good esteem; and, therefore, the executors cannot be blamed if they were deceived, nor could *Spence* be blamed for giving confidence which had been so often redeemed.

"II. The second ground on which the rights of the defendants are assailed is, that *Richards* gave the name of *Spence* as purchaser. If this were true, and it was without the knowledge of *Spence*, it would not bind him; but it rests only on the testimony of *Boon*. The testimony of *Boon* is as unbusiness-like and as little to be relied upon, as the loose and careless manner in which he acted, and it is contradicted by the testimony of *Brown*. On monday, *Boon* was notified by *Brown* to be on his guard; and although *Finch*, the author of the suspicion, had only general grounds to proceed upon, yet the caution was of a very pointed character. He neglected it for insufficient reasons, and when again reminded, on tuesday, admits that he wholly forgot the matter. I consider, therefore, that it is not proved that *Richards* gave the name of *Spence*, as purchaser; and the facts of the case, viz: *Boon's* order, and the entries in *Graesbeck's* weighing-book disprove it. The weigher inserts the name of the principal, except where the individual acts as broker, and then he describes him as such, which was not done in this case.

"III. The third ground on which the rights of the defendants are assailed is, that *Spence* did not make an advance upon the cotton, after it was purchased from *Leverich*; but that he had previously agreed to pay *Crenshaw*, and therefore does not come under the head of a merchant advancing on possession of the property. I consider it as proved that *Spence* did agree to pay *Crenshaw*, before the cotton was bought by *Richards* from *Leverich*; but it is to be recollected that *Richards* represented to *Spence* that he had already purchased the cotton, and, in point of fact, such was the case with regard to the 126 bales bought of *Smith & Carroll*. *Spence* agreed to make the advance on this representation, and the promise to pay *Crenshaw* was a part of that advance. In point of fact the money was not paid to *Crenshaw*, until after the cotton had been purchased by *Richards* from *Leverich*.

"Upon the whole matter, therefore, I am of opinion that *Gower, Nephews & Co.* must be protected in the advances made by their agent, on property placed in their possession, which property had been sold, and the possession of it regularly parted with by the plaintiff.

There was judgment below in favor of *Gower, Nephews & Co.*, and of *Behan & Freeland*, from which the plaintiff appealed.

*Micou* and *Lockett*, for the appellant. 1. *Richards* obtained his possession by fraud and false pretences. Under such circumstances he could not give to *Spence* a higher claim than he had himself. His falsehood, in representing himself as buying for another, was punishable criminally. Bullard & Curry's Dig. 250. *Andrew* v. *Dietrich*, 14 Wend. 34. *D'Wolf* v. *Babbett*, 4 Mason, 294. *Gasquet* v. *Johnson*, 2 La. 516. The equity of a vendor equals that of a factor or purchaser, except when the vendor has voluntarily parted with possession. *Russell* v. *Favier*, 18 La. 589. *Marks* v. *Landry*, 9 Rob. 526. Absolute possession was not delivered. The sale was for cash, and it was understood that the price was to be paid before *Richards* became owner. Mason 294.

2. *Spence's* advances were not made in the usual course of business, nor with proper caution. He was put upon his guard. He knew of other frauds committed by *Richards*, and had every reason to suspect that he had not paid for the cotton now in dispute. His principal object in the transaction was to avoid litigation with *Fearn, Crenshaw & Co.*, whose ship receipts confronted his bills of lading; and his anxiety to release that shipment, and his haste to depart, led him into errors, amounting to gross negligence, if not legal *mala fides*. 1 Smith's Leading Cases, 258, 431, 43 Law Library. Story on Bills, § 194. *Lanfear* v. *Blossman*, ante p. 148. *Fetter* v. *Field*, ante p. 80.

3. *Spence* was improperly discharged as a defendant and sworn as a witness. His evidence differs from that of the other witnesses. He alone pretends that the $4,780, paid to *Fearn, Crenshaw & Co.*, was a specified advance on this shipment. As agent of foreign merchants, he was liable personally on his contracts. 2 Smith's Leading Cases, 222 n., 44 Law Library. He had voluntarily united his personal obligation with that of his principals, in the bond given in this case to release the sequestration, and the bond was accepted by plaintiff. The agent who contracts in his own name *adds* his responsibility to that of his employers. *Hyde* v. *Wolf*, 4 La. 236. *Hopkins* v. *Lacouture*, Ib. 66. Pothier on Obligations, § 82, 448. Story on Agency, § 270. Accepting the responsibility of the employers, did not release the agent previously bound. Civil Code, art. 2188. *Bonnemer* v. *Negrete*, 16 La. 474. But this is not an action *ex contractu*. There is no contract and no privity between the plaintiff and *Spence*. The plaintiff claims his cotton in the hands of *Spence* as a trespasser or wrong doer. The action is one *ex delicto*. If the principals come in voluntarily, profit by the act of their agent, and adopt it as their own, they make themselves liable, but do not discharge the agent. The agent and principal are equally, and *in solido*, liable for torts. Civil Code, arts. 2299, 2304, amended by act 1844. They may be sued jointly or severally, at the choice of plaintiff. Browne on Actions, pp. 112, 115, 45 Law Library.

4. The payment of $4,780, to *Fearn, Crenshaw & Co.*, was not an advance on the cotton in dispute. It was made on the mere credit and promise of *Richards*, and cannot, against the plaintiff's right as owner, or his lien as vendor, be imputed to this lot. His privilege for advances rests entirely on art. 3114 of Civil Code. The amending act of 1841, p. 22, does not relieve him, because the plaintiff is a resident creditor, having a privilege, and therefore within the proviso of that act. *Baldwin* v. *Bracy*, 1 La. 364. *Grey* v. *Bledsoe*, 13 Ib. 491. *Hagan* v. *Sompeyrac*, 3 Ib. 157. *Collins* v. *Austin*, 3 Ib. 302. *Park* v. *Porter*, 2 Rob. 345. The remaining payments were made after *Spence* had been doubly cautioned, and for them he deserves no protection from the law.

5. The cotton belonged to a succession. The questions whether the will of deceased gave his executor power to sell by private sale, and whether the intention of the executors so to sell, divested the rights of the estate, are submitted to the judgment of the court.

*T. A. Clarke* and *E. A. Bradford*, for the defendant *Spence*, and the intervenors. 1st. There was possession and property in *Richards*. The evidence establishes that he was the purchaser ; that there was no false pretence held out by him to induce the plaintiff to part with possession, and that he did part with it. 2d. If there was an error as to the person, it did not invalidate the sale. Civil Code, arts. 1828, 1830. Pothier, § 19. But there was no such error. 3d. If there was error, it was the result of gross negligence on the part of plaintiff, or of his agents. 4th. There was no false pretence held out by

LEVERICH<br>*v.*<br>RICHARDS.

*Richards.* 5th. Though *Richards* acted in fraud, the title of intervenors must prevail. 13 Wendell, 570. 2 Fairfield, 227. 2 Blackstone, 450. 8 Cowen, 238. 12 Pick. 307. Chitty on Contracts, 415. "No principle is better established in law or moral justice, than that third persons, acting in good faith, shall not be prejudiced by the frauds of others in which they had no agency." 11 La. 401. 18 La. 585. 6th. Intervenors acquired possession and property *bonâ fide,* for a *new* and valuable consideration and in the ordinary course of business. Vide 12 La. 263. The *advace* was *specific,* and covered by the article. Civil Code, art. 3214. 14 La. 473-7. 18 La. 328. 11 Rob. 140. 7th. *Spence* was a competent witness. Though a party he may be a witness. 2 Mart. N. S. 455. 5 Ib. N. S. 7. 2 La. 473. Benjn. & Slidell's Dig. title Evidence, no. 209. In chancery proceedings, which are analogous to those of civil law, "the evidence of one defendant may be read for another defendant, and also for the plaintiff," if he is without interest. Bennet's Chanc. Practice, 27th vol. 3d Series Law Lib. p. 13. *Kirk* v. *Hodson,* 2 Johns. Chancery Rep. 550. The bond was discharged by the deposit of the money. *Spence* was merely an agent in the transaction; and it has been held "that an agent is a competent witness in all matters connected with his agency, without a release, and his being liable for costs will not render him incompetent, if he is at the same time agent." 5 Mart. N. S. 274. See cases in Benjn. & Slidell's Dig. Evidence p. 209, no. 46.

*C. M. Jones,* for the defendants *Behan & Freeland.*

The judgment of the court was pronounced by

EUSTIS, C. J.* After the death of *James H. Leverich* his former commission house was continued in his name by his executor, for the purpose of liquidating its concerns. The immediate charge of the business appears to have been entrusted to the former clerks of the deceased. The executor, being otherwise actively employed, exercised only a general supervision over it. The plaintiff in this suit charges, that *Richards,* pretending to act as a broker for the defendant *Spence,* under certain false pretences, fraudulently obtained possession of two hundred and fifty-three bales of cotton, which the house of *J. H. Leverich* held as factors for sale, without paying the price. He makes *Richards* and *Spence* defendants, and prays for judgment for a restitution of the cotton adversely to the claims of *Spence,* who, he alleges, has obtained the control of the cotton, under an advance made by him to *Richards ;* he alleges that the cotton had been shipped immediately, and the marks changed. He also prays in the alternative for judgment against *Richards* and *Spence, in solido,* for the price, the sum of $7155 70. *A. A. Gower, Nephews & Co.* intervene, and make themselves parties defendant. Judgment is prayed for by the plaintiff against them, as well as against the original defendants.

The two hundred and fifty-three bales of cotton having been sequestered, were bonded by *Spence* and the intervenors. *Richards* had absconded, and no service was made on him. *Spence* answered, but his answer is merged in the petition of intervention, in which he united himself as a party. The intervention changes in no respect the issue between *Spence* and the plaintiff, and is a mere addition of the parties as defendants. The intervenors allege that, they are the principals in the transaction; that the advance was made on their account, on the shipment to them; and it charges in general terms their superior

---

* SLIDELL, J., having been of counsel in this case, did not sit on its trial.

rights to the two hundred and fifty-three bales of cotton, and the regularity and good faith of themselves, and of the conduct of their agent, *Spence.* They deny all the allegations of the petition, except those expressly admitted by them.

*Spence* charges that he was the agent of *A. A. Gower, Nephews & Co*; and it is alleged that they are the principals, and are solely interested in the event of the suit. He was discharged by the court below as a party defendant, and, under a full release from the intervenors and the cancelling of the bond given under the sequestration, by the deposit of the amount in court, was examined as a witness for his principals, the intervenors. On the propriety of this act of the court in discharging him as a party against the consent of the plaintiff, we wish to be understood as giving no opinion.

We had at one time almost come to the conclusion to remand this case for a new trial, before a special jury of merchants ; but a further examination of the facts has satisfied us that, it is our duty definitely to determine it. The case is fully stated in the opinion of the judge of the Commercial Court. The evidence is in some respects contradictory, but there are certain points which we consider to be established beyond a reasonable doubt, and upon which we base an opinion.

*Richards* was a cotton-broker, known generally, and doing business as such, and having no credit except that which he derived from being entrusted with the business of other persons. *Spence,* up to the time of *Richards'* absconding, had extensive dealings with him on his own account, and on account of others, *Richards* sometimes trading in cotton in his own name. The sale of cotton, which is the subject of the present suit, was made to *Richards* as a broker, and would not have been made to him on his own account, by reason of his want of credit. The sale was made on account of *Spence,* as the vendor believed, or of some principal whose name was not disclosed. The pretended purchase, and obtaining possession of the cotton on behalf of *Richards,* was a fraud. The delivery on behalf of the vendor of the cotton to *Richards,* under these circumstances, was not a delivery to the principal, (supposing him to have been employed by one,) under the contract of sale ; but created in *Richards* merely a possession as a broker, and nothing else, for and on account of the vendor, which possession as a broker he was bound to part with in favor of his principal on the payment of the price, and on no other condition. If, on the hypothesis of the defendants and intervenors, *Richards* had no principal, he had no possession but that based on fraud ; and, being known publicly as a broker, every one traded with him for the article at his peril, unless he put himself in communication with its owner.

Admitting that, having possession of the cotton in his own name, was a proof of some authority on the part of the owner of the cotton, it could only be considered as indicating the assent of the latter to a sale for cash, in the usual course of business. If a broker do not disclose the name of the purchaser, the seller assents to a sale for cash, and possession is given to the broker, to deliver the article to the purchaser, whoever he be, *for cash.* This is the limit of the power of the broker. But *Spence* did not purchase the cotton ; he made an advance on it, and took it in pledge. We look in vain for any pretence for any such authority on the part of the broker, thus to dispose of property committed to his charge for a special purpose. There is no evidence that, it is in the usual course of trade for shippers to employ brokers for the purpose of obtaining advances on their shipments, and that the custody of merchandize and produce is entrusted to them for that object.

LEVERICH
*v.*
RICHARDS.

LEVERICH
v.
RICHARDS.

We then have the naked fact, of *Spence* making this advance to this broker on the cotton, and obtaining from him the article in pledge for the amount. Did he acquire thereby only the rights of *Richards*, the broker, or extinguish all the claims of the owners of the cotton, and thus enable *Richards* to complete the fraud under which he had obtained the possession of the cotton, is the question we have to determine.

The broker is considered in law as the mandatary of the two parties to the the contract which he undertakes to make for them ; he owes fidelity to both. Commercial brokers, we understand, are governed in their duties by the laws and usages of commerce. When a merchant treats with a broker, acting in his ordinary line of business, in his relations with the intermediary are involved the interests of other persons. The law on this subject we understand to be established by numerous decisions.

When a broker sells goods without disclosing the name of his principal, he acts beyond the scope of his authority ; his principal is not bound by the consequences of such a sale, and hence he cannot be affected by any claim of set-off which may exist between the broker and the vendee. It will be sufficient, it appears, to deprive the purchaser of this right, if he knew that the seller was a broker, even without knowing that he acted as a broker in the particular instance ; and where it is doubtful whether a party sells as a broker or not, it is the duty of the buyer to make inquiry in order to satisfy himself of the fact. If however the principal enables the broker to mislead the purchaser, as by delivering to him either the possession of, or the *indicia* of property in, the goods to be sold, it will be otherwise. *Baring* v. *Corrie*, 2 B. & Ald. 137. Russell on Factors and Brokers, p. 108. Now, on this principle, the possession of the cotton by a cotton broker, could only induce a purchaser to believe that he had authority to sell. Nothing else could be inferred from his being entrusted with it by the owner. Had *Spence* purchased, and paid for this cotton in the usual course of business, a very different case would have been presented. He did not do it ; but made a contract with the broker, which he had no reason to believe the broker had any authority to make. The reasoning of chief justice Abbot, in the case above cited of *Baring* v. *Corrie*, is applicable to every part of this case. He says :

" The plaintiffs in this case have only reposed the usual confidence which any merchant must place in his broker ; and it will not be safe hereafter for any merchant to employ a broker, if the defendants should succeed, for the broker might, by delivering to the buyer a false note, defeat the rights of his principal altogether."

In the present case we can perceive no want of caution on the part of the seller, and no false credit given to the broker, by entrusting him with the custody of the cotton to be delivered to the purchaser, be he known or unknown, on the payment of the price.

Persons engaged in mercantile transactions must be presumed to know what contracts are within the authority of a broker. " It would be well," says Lord Ellenborough, " if traders, when they deal with brokers, would make themselves secure, by first inquiring whether they will be borne out in dealing with them in that character. It would save a great deal of risk and litigation." 6 Maule and Selwyn, 4.

Where the payment by a purchaser to a broker, was not made in the way authorized in the original contract, it was held that it was not available as a defence to the claim of the principal. 1 Starkie, 233. Russel on Factors, 106.

There are some facts in this affair which ought not to be overlooked, inasmuch as they tend to show a degree of looseness and levity in the transaction of important business, which ought to be discountenanced by men of business. By the testimony of *Carroll* and of *Crenshaw* it appears that *Richards* was not only without credit and pressed with debt, but unprincipled, and entirely unscrupulous in his means of raising money. · A knowledge of the transaction with *Crenshaw*, was brought home to *Spence* early on saturday, the day of the sale to *Richards*, after which he made a payment to *Crenshaw's* house on *Richards'* account, and on monday *Carroll* apprized him of a fact which ought to have arrested all business between them. It did not produce that result; but, on the day following, tuesday, the balance due *Richards*, $2956 26, was paid to his clerk; and the day before, on monday, after *Crenshaw's* affair had been closed, he paid the same clerk $3700. It is utterly impossible to permit the vendor to be deprived of his property and the price, by means of this kind. They can receive no countenance from us.

Being satisfied that this sale of cotton was made to *Richards* as a broker for *Spence*, or for some principal unknown, and not to him personally, what claims can *Spence* urge to receive it? *Richards* was publicly known as a broker, and *Spence* well knew that he had not credit or means enough to purchase the cotton on his own account. *Spence* made an advance on the cotton for shipment to the intervenors, but he could not believe that *Richards* had been entrusted with the cotton for the purpose of obtaining an advance. Even the first sum that *Spence* advanced, $4500, was paid by him to meet a flagrant defalcation on the part of *Richards*, in his transaction with *Crenshaw*—not to the owners of this cotton, but to *Crenshaw's* house. This was on saturday, and after notice of the deficit from *Crenshaw* himself. The whole affair originated and was carried through in the confidence which *Spence* thought proper to place in *Richards*, and if it is thought that such transactions are in the usual course of business, and can be supported by courts of justice, it is time that such an error should be dispelled.

It is therefore ordered that, the judgment of the Commercial Court be reversed, and the plaintiff recover from the intervenors, *A. A. Gower, Nephews & Co., in solido*, the sum of $7155 70, with interest from judicial demand and costs in both courts; and it is further ordered that, there be judgment in favor of *Behan* and *Freeland* called in warranty.*

---

* *T. A. Clarke* and *E. A. Bradford*, for a rehearing. *Richards*, when he obtained the possession of the cotton, with every apparent right of ownership, was invested with full power over it, to sell it, or to pledge it for advances. The plaintiff, by giving him the possession, with all the indicia of property, put him in a position to hold himself out to the world as the owner, and all persons dealing with him in good faith are entitled to protection. If *Richards* abused his possession of the cotton for a fraudulent purpose, the loss must be borne by the party, whose misplaced confidence in entrusting him with the possession of the cotton, enabled him to commit the fraud, and not by the party who dealt with him upon the faith of that possession.

The general rule of law, established in the jurisprudence of all the leading commercial nations of the world, in reference to moveables, is, that "possession constitutes title." This rule, it is said, was introduced on grounds of public expediency, and from favor to commerce and to the free transfer of goods. The doctrine of the civil law was, "*Nemo plus juris ad alium transferre potest, quam ipse haberet.*" But a relaxation of this principle has been introduced into modern jurisprudence, " to the effect of allowing the possessors of goods, and others in the apparent right of commodities, not only to sell, but to pledge them." 1 Bell's Commentaries, 485. The common law of England contained a remarkable exception to this general rule, in respect to factors, who, though vested with an undoubted right to sell the goods in their possession, were held to have no right to pledge them. The propriety of this exception was often questioned upon principle, as the

factor is always enabled to hold himself out to the world as owner, and its bad effects upon trade were so much felt that the House of Commons named a committee of inquiry upon the subject. The committee reported that, in foreign countries, the rule, as applied to moveable property, was, "that 'possession constitutes title,' and that persons making advances of money on such property are not required to inquire to whom it belongs, and are fully protected for the advances they make. This," the committee stated, "may be taken to be the law of France, Portugal, Spain, Sardinia, Italy, Austria, Holland, the Hanse Towns, Prussia, Denmark, Sweden and Russia." It was also the law of Scotland. The committee recommended that the rule of the foreign laws should be adopted in England. They were of opinion, that "though some frauds would be the consequence of such an alteration of the law, yet the great and almost universal benefit to be derived by trade from the removal of injurious restrictions, would so enormously overbalance the disadvantage as to render it of comparatively little importance." Accordingly, a gradual change was made in the rule of the common law, by successive acts of Parliament, till the act of 5 and 6 Victoria placed the law of England, in this respect, on essentially the same footing with the laws of the other states of Europe.

A strong and familiar application of the principle above stated, has been made in the case of goods purchased under false pretences. A sale founded on fraudulent representations is wholly null and void, *ab initio*, and operates no transfer whatever of title between the parties. The possession of the fraudulent purchaser is a mere naked possession. which gives him no right of property, and which he is bound to surrender to his vendor. But if the purchaser, while in possession of the property, sells or pledges it to a third person, acting in good faith, such third person will hold the property, in preference to the original owner. "The reason is, that the original owner, by putting his goods in the hands of the fraudulent vendor, has reposed confidence in him, and has enabled him to commit a fraud; therefore the equity of the original owner is not equal to that of the person who has, *bonâ fide*, parted with his money or property in the purchase of such goods. The original vendor, by his imprudence, enabled the fraudulent vendee to defraud some one, and should himself be the sufferer, rather than a third person, who must otherwise be defrauded." *Russell* v. *Favier*, 18 La. 589.

The counsel for the plaintiff in this case assumed the position, that *Richards* obtained possession of the cotton by fraud, and therefore that the plaintiff was entitled to recover it back, even from the intervenors, whose rights to it were acquired in good faith, and without notice of the character of the possession by *Richards;* but the law on this point seems to be too well settled in this State to be shaken. The court appear to concede this, for they go further, and place their opinion on the special ground that, as *Richards* was "known publicly as a broker, every one traded with him for the article at his peril, unless he put himself in communication with its owner. Admitting," it is said, "that having possession of the cotton in his own name was a proof of some authority on the part of the owner of the cotton, it could only be considered as indicating the assent of the latter to a sale for cash, in the usual course of business."

The only question in the case, then, is this: Was the known character of *Richards*, as a cotton broker, notice to the world, that the cotton in his possession was not his property, that his possession of it, though accompanied with all the indicia of property, was only the possession of a broker, and that his authority over it was limited to a sale of it for cash?

All the writers on commercial law are agreed in their definition of a broker. He is an agent employed to make bargains and contracts between other persons, in matters of trade, commerce, or navigation, for a compensation commonly called brokerage. He is a mere negotiator between other parties, and never acts in his own name, but in the names of those who employ him. Where he is employed to buy or sell goods, he is not entrusted with the custody or possession of them, and is not authorised to buy or sell them in his own name. Story on Agency, 28. Russell on Factors, 4.

Bell, in his Commentaries, says: "Brokers are employed merely in the negotiation of contracts relative to property, with the custody of which they have no concern." 1 Bell's Com., 477. The articles of the Civil Code of this State, in respect to brokers, are in accordance with these definitions. C. C., arts. 2985–89.

It results, therefore, that the office of a broker is of a known and limited character. He is an intermediate negotiator between other parties, and nothing more. So long as his employment is confined within the limits which the law and the usages of merchants have affixed to his office, his known character, as a broker, is notice to all the world of the nature and extent of his authority; but if either party entrusts him beyond those limits, he does so at his peril. A broker, on the one hand, has nothing to do with the possession of property; consequently, if the vendor delivers to him the property, and he absconds with it, the loss must be borne by the vendor. He has nothing to do, on the other hand, with the receipt of the price; therefore, if the vendee pays the purchase money to him, and he absconds with it, the loss must be borne by the vendee. Whenever a broker is employed beyond the recognised limits of his office, or out of his proper sphere, his character as a broker ceases to be notice to the world of the nature and extent of his employment, or that he is employed, in the particular instance, as a broker at all.

What consequences follow from the application of these principles to the case before the court ? The sale, it is said, was made to *Richards*, as a broker. Then he had nothing to do with the possession of the property. If the plaintiff considered *Richards* as merely a broker in the transaction, he knew that, in delivering the property into his possession, he was departing from the usages of merchants; that he was placing a trust in him which did not belong to his character as a broker, and which he might use to mislead third persons. He took the risk, therefore, of all such consequences upon himself.

It is admitted that, if *Richards*, having possession of the cotton, had sold it to any purchaser in good faith, and absconded with its price, the loss would have fallen on the plaintiff. The intervenors contend that, this is only true on the broad principle heretofore stated, that as the plaintiff had given his property into the possession of *Richards*, and thereby enabled him to hold himself out to the world as its owner, the loss, if he made a fraudulent disposition of it, must fall on the plaintiff, rather than on an innocent third person. Such is the doctrine of the case of *Baring* v. *Corrie*, 4 B. & Ald., 137, cited by the court. It was held that, "if a broker sells goods without disclosing the name of his principal, it will be sufficient to deprive the purchaser of the right of set-off, if he knew that the seller was a broker, without knowing that he acted as broker in the particular instance; and that where it is doubtful whether a party sells as a broker or not, it is the duty of the buyer to make inquiry to satisfy himself of the fact. If, however, the principal enables the broker to mislead the purchaser, as by delivering to him either the possession of, or the indicia of property in the goods to be sold, it will be otherwise." According to this case, then, where a broker has possession of the property to be sold, his known character as broker, so far from being notice that he holds the property in that capacity, is not sufficient even to put a purchaser on inquiry; and where such possession misleads a purchaser, the loss must be borne by the seller.

It is said that, on the principle of the authority cited by the court, "the possession of the cotton by a cotton-broker could only induce a purchaser to believe that he had authority to sell; nothing else could be inferred from his being entrusted with it by the owner." Certainly such is not the full force and meaning of the authority cited. The inference necessarily suggested by a broker's possession of the property to be sold, does not relate to the extent of his authority, but to the character in which he acts. The authority of a broker to sell is not evidenced by the possession of the property; on the contrary, it was expressly held, that such possession was calculated to mislead the purchaser, and that, if the broker had held possession of the property, or the indicia of its ownership, the case would have been otherwise.

The importance which the court attach to the case of *Baring* v. *Corrie*, warrants a brief examination of it. The *Barings* employed *Coles & Co* , as brokers, in the usual course of business, to sell a quantity of sugars. *Coles & Co.* sold the sugars to *Corrie & Co.* in their own names, and without disclosing that they acted as brokers. The sugars appeared to have been sold on a credit of sixty days. In London, when a broker negotiates a sale, he gives to the buyer a note of the sale, called a "*sold note*," and to the seller a like note, called a "*bought note*," in his own name, as the agent of each, and by which they are respectively bound; but when no broker is employed, the parties are required to give their own notes. In this case *Coles & Co.* sent a "bought note," in the usual form, to the *Barings*, but gave a "sold note" in their own names to *Corrie & Co.*, without, however, requiring from them a "bought note" in return. *Coles & Co.* kept, as by law they were required to do, a memorandum book of all their contracts as brokers, in which the sale of the sugars was regularly entered. *Coles & Co.* never had possession of the sugars, but the order for their delivery was drawn directly in favor of *Corrie & Co.* *Coles & Co.* failed soon after, and were largely indebted to *Corrie & Co.* When the price of the sugars became due, *Corrie & Co.* attempted to set-off the amount against the debt of *Coles & Co.*, and the *Barings* consequently brought suit against them. It was held that the plaintiffs should recover, because they had employed the broker strictly according to the usual course of trade, without giving him the possession of the property, or the muniments of title, or contributing in any way to enable him to mislead the purchaser. It was held that the defendants, on the other hand, had shown a want of due care and diligence to avoid the fraud which had been practised on them. The known character of the broker, who had no possession of the property which he offered to sell, and who stood towards it only in the usual relation of a broker, was thought sufficient to put the purchasers on inquiry. The fact that the defendants received a "sold note," and were not required to give a "bought note" in return, was considered almost equivalent to direct notice that *Coles & Co.* were brokers, and not the owners of the property; and lastly, it was insisted, that if the defendants had asked to see the book in which the brokers were bound to keep the account of their sales in that capacity, they would instantly have discovered whether *Coles & Co.* were acting as brokers, or not. The decision was placed on the ground that the plaintiffs had not been guilty of any negligence, and that the defendants had been guilty of great negligence. It appears, however, that if the plaintiffs had given to the broker the possession of the property, or the indicia of title, and thus enabled him to practise a fraud on the defendants, the decision would have been different, and the plea of set-off would have been allowed. It seems, therefore, that when a broker has possession of

LEVERICH
v.
RICHARDS.

the property to be sold, a third person, acting in good faith, may not only buy for cash, but may buy and set-off an old debt against the price; that is, he may take the property from the broker in payment of an antecedent debt. This is entirely inconsistent with the deduction which the court make from the case, that a broker's possession of property " could only induce a purchaser to believe that he had authority to sell." It can only be supported on the ground, that a broker's possession warrants the belief that he holds the property as owner, and not as a broker.

In the case now before the court Richards did have possession of the property, with all the indicia of its ownership. It is conceded that Spence might have bought the cotton from Richards, and paid him for it, with safety. This admission must rest upon the principle, that the possession of property by a broker will protect the world in dealing with him as its owner.

The court proceed to take the distinction, that " Spence did not purchase the cotton, but made a contract with the broker, which he had no reason to believe the broker had any authority to make." The ready, and, it would seem, sufficient answer, is, that Spence neither knew, nor had any reason to believe, that Richards was acting as a broker in the case. His possession of the cotton was inconsistent with that character. It is not pretended that Spence had any other notice that Richards was so acting, than that which his known character, as a broker, carried with it; and such notice was destroyed by his possession of the property. It has already been seen that, where a broker has possession of property, his known character as a broker is not sufficient even to put a purchaser on inquiry. The same principle is applicable to the case of a party making advances.

The position which the court assume is thus stated: " Spence did not purchase the cotton; he made an advance on it, and took it in pledge. We look in vain for any pretence for any such authority on the part of the broker thus to dispose of property committed to his charge for a special purpose. There is no evidence that it is in the usual course of trade for shippers to employ brokers for the purpose of obtaining advances on their shipments, and that the custody of merchandise and produce is entrusted to them for that purpose."

It is assumed here, that the known character of Richards as a broker, notwithstanding he had the possession of the cotton, was notice to the world that he had only the authority of a broker in regard so it. Such an assumption is against all the authorities, and against all the commercial usages which regulate the employment of a broker. The plaintiff violated all commercial usages when he committed the cotton to the charge of a broker at all. It is not in the usual course of trade for shippers to employ brokers to obtain advances upon their shipments, and the custody of merchandize and produce is not entrusted to them for that purpose. The necessary inference, therefore, from the possession of the cotton by Richards, was, that he did not hold it as a broker, but as the owner of it. Certainly, it is in vain to look for any usage of trade to ascertain the authority of a broker over property of which he has the possession, and which he offers for shipment under advances, for the simple reason that, in the usual course of trade, brokers are never so employed. It must be in vain to look for a usage to govern those cases which only arise from the violation of all usages.

It is held that, " where a broker sells goods without disclosing the name of his principal, he acts beyond the scope of his authority." The converse of the proposition is equally true, that where a broker buys goods without disclosing the name of his principal he acts beyond the scope of his authority. On the hypothesis that the plaintiff regarded Richards as a broker, he must have known that Richards exceeded his authority in buying the property in his own name. He should have insisted, therefore, on the disclosure of the name of his principal, before he delivered the property. He neglected to do it. He did not inquire, even, of Richards, the name of his principal, or if he had any principal at all. He dealt with him as if he were himself the principal, and, by delivering the property to him, enabled him so to hold himself out to the world. He thus forfeited the protection which, according to the usages of trade, the known character of Richards as a broker might otherwise have afforded him, and placed his reliance upon his personal integrity and good faith. He, therefore, must be the party to suffer by his fraud. He cannot invoke the usages of trade, because his own violation of those usages was the sole occasion of the loss. In the words of the case of Baring v Corrie, before cited, as the general principle is there stated by the court, the plaintiff, " by improper conduct on his part, enabled another person to appear as proprietor of the goods, and, by that means, to impose on a third person, without any fault on the part of that person."

If this reasoning be correct, there is no foundation for the distinction between a sale and a pledge of the property by Richards. A pledge is in the nature of an alienation—it is an alienation pro tanto. Both are acts of ownership; and if third persons, who dealt in good faith with Richards, as the owner of the property, are to be protected, it can make no difference whether they claim as purchasers or as pledgees. The same principle which applies to the one case, is applicable to the other. Such is the well-established law in the case of a conflict between the original owner and a third person, in regard to property sold upon fraudulent representations. There is no equitable ground for any such distinction, and no authority is cited for it. The distinction made in the case of a factor, between his

power to sell and his power to pledge, does not apply. No analogy holds between the two cases. A factor has the possession of property—a broker has not. The possession of a factor, therefore, does not enable him to mislead third persons—the possession of a broker does enable him to mislead them; and the intervenors rest their claim on the ground that *Richards* was thus enabled by the plaintiff to mislead them, without any fault on their part.

So far, this case has been examined according to the strict principles of law, in relation to the office of a broker, as established by the English authorities to which the court refer, and by the elementary writers. It is impossible, however, to overlook the consideration, that the case has arisen in a country where the state of society and the usages of trade are widely different from those of England. Here, the same sub-division of labor, and distinction of employments and professions, does not exist, which is there established. The case of *Baring* v. *Corrie* occurred in the city of London. Brokers are there subject to strict regulations, established by the mayor and aldermen, in pursuance of the act of William III. Among those regulations are the following: " That every person, upon his admission, shall take an oath, truly and faithfully to execute and perform the office of broker between party and party, in all things pertaining to the duty of the said office, without fraud or collusion, to the best and utmost of his skill and knowledge; that he shall, in all cases, reveal the name of his principal, and neither deal in goods on his own account, nor barter and sell again, nor make any gain in goods beyond the usual brokerage, and that he shall regularly register all the contracts into which he enters." Brokers also give a bond for the faithful performance of their duties as set forth in their oath of admission, and receive a medal, as evidence of their qualification. In New Orleans, on the other hand, brokers are subject to no regulations or restrictions whatever. Many persons, as appears to have been the case with *Richards*, adopt the employment only as a temporary resource. Having been previously engaged in other business, they still continue, notwithstanding their employment as brokers, to do business, to a greater or less extent, on their own account. They deal, not only in the article with which they are connected as brokers, but in every variety of commodity to be found in the market. They are speculators as well as brokers. Sometimes, too, they lend their names to cover the speculations of others.

The operations of *Richards*, as they appear in evidence upon the record, furnish proof of the justice of these remarks. During the season in which this case occurred, he made shipments to the intervenors, through their agent, on which he received $60,000, or thereabouts, for advances. In all these shipments *Richards* had the sole, or a joint interest. The fact that he had dealt in cotton on his own account to such an extent, seems a sufficient answer to the objection that he could not have purchased the cotton in the present instance on his own account, "by reason of his want of credit." The court say that, " *Richards* sometimes traded in cotton on his own account." In all the transactions to which the court refer *Richards* was interested on his own account and in his own name, and never had any transactions of any other kind with the agent of the intervenors. The very extent of these previous transactions, and the regularity with which they had always been conducted, contributed to the facility with which *Richards* was enabled to effect the shipment of the cotton which he had obtained from the plaintiff, and to procure an advance upon it. It is evident from these facts that, the implied notice, which the known character of a broker carries with it, is not the same in London and in New Orleans, and that it is impossible to reason from cases in the one place to cases in the other, without great caution, or great injustice.

If, however, the intervenors do not receive the assent of the court, so far as to induce them to affirm the judgment of the court below, they would still suggest that the case presents a proper occasion for the exercise of the discretion of the court, in remanding it for a new trial before a special jury of merchants. Such is stated to have been the first impulse of the court, and the novelty and importance of the questions involved would well warrant that disposition of the case. These questions were not agitated in the court below, and there is no evidence in the record to assist the court in the decision of them. They involve, however, the usages of trade in New Orleans, in reference to the most important article of its commerce, and upon which interests of vast magnitude depend. The intervenors believe that the court have mistaken these usages, and that their judgment, as it now stands, not only deprives them of rights which they acquired in the regular course of business, and with perfect good faith, but tends to establish a principle which will disturb the free course of trade, obstruct the transfer of property, and retard the improvement of our commercial jurisprudence.

The court conclude their judgment with some animadversions on the " levity and looseness" with which business was conducted in this case. They seem, however, to overlook repeated acts of the grossest irregularity and negligence on the part of the plaintiff, and which, weighed in an even scale, must overbalance all other considerations. His first and fatal error, if, as is now alleged, he considered *Richards* as merely a broker in the purchase of the cotton, was in giving him an order for the possession of the cotton, instead of requiring the disclosure of the name of his principal. But even after that order was given, the whole loss is plainly traceable to the negligence and misconduct of *Boon*, the

LEVERICH
*v.*
RICHARDS.

clerk, to whom the business of the plaintiff was entrusted. On sunday, 30th June, *Brown* received an ambiguous caution from a third person, to be on his guard against *Richards* in the transaction. On monday, the 1st July, *Brown*, acting in a prompt and upright manner, called on *Boon*, at the office of the plaintiff, and inquired of him if he had obtained payment for the cotton from *Richards*, and communicated to him the caution, such as he had received it. He repeated his caution to *Boon* on tuesday, the 2d July, a second, a third, and, he thinks, a fourth time. *Boon's* reply to these repeated cautions, as *Brown* states, was, that " he was not afraid; that he had claims on the cotton until it went on board the ship." Such a reply seems hardly consistent with the pretension, that *Boon* regarded *Spence*, well known to be a responsible party, and not *Richards*, as the actual purchaser of the cotton. *Boon's* explanation is, that the reason he felt no alarm was, that "news had been received between saturday and monday that made a depression in the market, and he thought that purchasers were going to throw up the cotton." This statement is not quite correct. The English advices to which he refers were received in New Orleans on friday morning, the 28th June, and had had their effect on the market before the sale; for the plaintiff effected the sale to *Richards* by lowering the rates at which he had previously held the cotton. *Boon* proceeds to state that, when the caution was repeated on tuesday, he " went to *Richard's* office to get the (weigher's) book and sales. *Richards* told him that he would bring it to their office by 11 o'clock. *Richards* did not bring the sales round, and witness (*Boon*) went after some other business, and forgot all about it till afternoon, when Mr. *Brown* met witness in the street, and told him he had heard that *Richards* had run away."

It is clear, from this testimony, that if *Boon* had attended to the caution of *Brown* on monday, when he first received it, he might have arrested, at the press, the delivery and shipment of the cotton, or, by calling on *Spence*, might have ascertained the fact that *Richards* was not purchasing the cotton for him, and have stopped the advances in his hands. By either course, the fraud would have been avoided; and can it be said that, in the words of the case of *Baring* v. *Corrie*, the plaintiff " used due care and diligence to avoid such fraud" ? On the other hand, the actual good faith with which the advances to *Richards* were made, on the behalf of the intervenors, is not questioned. The convincing proof of that good faith is found in the fact, that those advances were made to the full extent which the value of the cotton at that time warranted, and even beyond what the sales of the cotton eventually justified, and that the whole amount of those advances was actually disbursed, in cash, after the contract for the shipment of the property was concluded.